UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF | ) | |
| COMPUTER SERVERS AND RECORDS | ) | Case No.: |
| OF GOOGLE INCORPORATED FOR | ) | |
| INFORMATION ASSOCIATED WITH | ) | |
| THE E-MAIL ACCOUNT | ) | UNDER SEAL |
| JFH1956@GMAIL.COM | ) | |

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT**

I, RICHARD J. PURYEAR, being duly sworn, depose and state as follows:

**I.      INTRODUCTION AND SUMMARY OF PROBABLE CAUSE**

1. I make this affidavit in support of an application for a warrant, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), to require Google Inc. (Google), a provider of electronic communication and remote computing services located at 1600 Amphitheatre Parkway, Mountain View, California, to disclose information associated with the e-mail account **jfh1956@gmail.com** (hereinafter the Target Account), including subscriber information, records, and the contents of wire and electronic communications,[1] and thereafter to authorize government agents to search that information and seize the items described with particularity in Attachment B to this affidavit and to the warrant.

2. As set forth in detail below, my investigation into the Target Account indicates that it is being used by James F. Hitselberger (HITSELBERGER) to contact others concerning the unlawful communication, delivery, and transmittal of classified information.   The facts uncovered by my investigation establish that there is probable cause to believe that the records

---

[1] Because this Court has jurisdiction over the offense under investigation, see 18 U.S.C. §§ 3238 and 3239, it may issue the warrant to compel the provider pursuant to 18 U.S.C. § 2703(a).  See 18 U.S.C. § 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation . . . .").

and contents of the wire and electronic communications pertaining to the Target Account are evidence, fruits and instrumentalities of criminal violations of the Espionage Act, 18 U.S.C. § 793(d), and of 18 U.S.C. § 1924.

## II.    AGENT BACKGROUND

3.  I am a Special Agent with NCIS, Washington, DC, assigned to the Office of Special Projects.   In this position I am authorized through Presidential Executive Order 12333, Department of Defense Directives and Instructions and Secretary of the Navy Instructions to conduct criminal and counterintelligence investigations associated with Department of Defense, Navy, and Marine Corps Commands.  I was hired by NCIS in August 2005 as a Special Agent.  I successfully completed the Federal Law Enforcement Training Center Criminal Investigator Training Program and the NCIS Special Agent Basic Training Program.   In addition, I have completed NCIS and Department of Defense training in foreign counterintelligence matters.  As a result of my training and experience, I am familiar with the tactics, methods, and techniques of foreign intelligence services and their agents and the methods used to collect U.S. national defense information.  I have also become knowledgeable with the enforcement of Federal laws pertaining to espionage and other foreign intelligence crimes.  Based on this experience, I have become well-versed in the methodology utilized by foreign intelligence services, individuals committing espionage and insider threat security violations committed for a variety of reasons. Based upon this experience and extensive training, I have become knowledgeable in the methods and modes of individuals committing crimes affecting the national security of the United States Government.

4.  Because this affidavit is being submitted for the limited purpose of establishing probable cause for a warrant to search the electronic and digital storage media and to seize

evidence, fruits, and instrumentalities of criminal activity that may be found therein, I have not included each and every fact known to me concerning this investigation.  Rather, I have set forth only those facts that I believe are sufficient to establish the necessary foundation for the search warrant.

5.   I make this affidavit based upon (a) personal observations and knowledge; (b) conversations with other law enforcement agents – both with NCIS and with the Federal Bureau of Investigation (FBI) – who have participated in this joint investigation and related investigations; and (c) review of documents connected with the investigation.  I believe the information received from others to be truthful and reliable to the best of my knowledge.  Where I have reported statements made by others, or from documents that I have reviewed, those statements are reported in substance and in part, unless otherwise indicated.

## III.    STATUTORY BACKGROUND OF VIOLATIONS

6.   Section 793(d) of Title 18 of the United States Code makes it unlawful for anyone who "lawfully having possession of [or] access to any document, writing . . . or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted or attempts to communicate, deliver, transmit or cause to be communicated, delivered or transmitted the same to any person not entitled to receive it." A person convicted under this section can be subjected to a fine or imprisonment of up to ten years, or both.

7.  Section 1924 of Title 18 of the United States Criminal Code makes it unlawful for any "contractor or consultant of the United States" to "knowingly remove[] [classified] documents or

3

materials without authority and with the intent to retain such documents or materials at an unauthorized location . . ."   A person convicted under this section can be subjected to a fine or imprisonment of up to one year, or both.

## IV.    BACKGROUND REGARDING COMPUTERS, THE INTERNET, AND E-MAIL

8.  I have received training related to computer systems and the use of computers during criminal investigations.   Based on my education, training and experience, and information provided to me by other law enforcement agents, I know the following:

a.     The Internet is a worldwide computer network that connects computers and allows communications and the transfer of data and information across state and national boundaries.  The term "computer", as used herein, is defined in 18 U.S.C. § 1030(e)(1) and includes an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.  A computer user accesses the Internet through a computer network or an Internet Service Provider (ISP).

b.     E-mail, or electronic mail, is a popular method of sending messages and files between computer users.  When a computer user sends an e-mail, it is created on the sender's computer, transmitted to the mail server of the sender's e-mail service providers, then transmitted to the mail server of the recipient's e-mail service provider, and eventually transmitted to the recipient's computer.  A server is a computer attached to a dedicated network that serves many users.  Copies of e-mails are usually maintained on the recipient's e-mail server, and in some cases are maintained on the sender's e-mail server.

9.  Google, located at 1600 Amphitheatre Parkway, Mountain View, California, provides free e-mail services through its Gmail brand.   Google maintains records pertaining to the subscribers of its Gmail e-mail services.   These records include account access information, transaction information, account application information, and other related information.

10.  Gmail subscribers can access their accounts on servers maintained and/or owned by Google from any computer connected to the Internet located anywhere in the world.   E-mail messages and files sent to a Gmail account are stored in the account's "inbox" as long as they are

not identified as "junk mail," the account has not exceeded the maximum storage limit, or the account is not set up to forward messages to another e-mail account.  If the message/file is not deleted by the subscriber, the account is below the maximum storage limit, and the account has not been inactivated, then the message/file will remain on the server indefinitely.   E-mail messages and files sent from a Gmail account will remain on the server unless the account user changes the default account settings.

11.   A sent or received e-mail typically includes the content of the message, source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail. If a Gmail user writes a draft message but does not send it, that message may also be saved by Google but may not include all of these categories of data.

12.   Gmail subscribers can also store other files, including e-mails, documents, address books, contact or buddy lists, calendar data, pictures, and other files, on Google's servers.

13.   Generally, Google asks each of its customers to provide certain personal identifying information when registering for an account.  This information can include the customer's full name, physical address, telephone number and other identifiers, e-mail addresses, and business information.  Google also retains records of the length of service (including start date) and types of services utilized.

14.   In some cases, a Gmail subscriber may communicate directly with Google about issues relating to an account, such as technical problems, billing inquiries, or complaints from other users.   Google may retain records about such communications, including records of contacts between the subscriber and Google's support services, as well records of any actions taken by the company or subscriber as a result of the communications.

15.   Computers and servers located at Google contain information and other stored

5

electronic communications belonging to unrelated third parties. Accordingly, this affidavit and application for search warrant seek authorization solely to search the accounts and/or files following the procedures described in the Attachment B to this affidavit.

## V.    FACTS ESTABLISHING PROBABLE CAUSE

16. On November 10, 2004, James Francis HITSELBERGER began working for Titan Corporation as a federal contractor, and was granted an interim SECRET security clearance.

17. On November 11, 2004, the U.S. Office of Personnel Management (OPM) began a Single Scope Background Investigation (SSBI) to determine HITSELBERGERS's eligibility for a Security Clearance. On September 08, 2005, OPM concluded the investigation and determined that HITSELBERGER was authorized to have a SECRET level security clearance. On December 31, 2011, OPM completed a SSBI Periodic Re-investigation (PR) and granted HITSELBERGER a SECRET level security clearance on January 18, 2012.

18. HITSELBERGER attended Georgetown University circa 1980, studying Arabic and history. He subsequently attended graduate school at the University of Texas at Austin in the early 1990's, studied politics, government and was working on an open ended PhD in an unknown subject. From October 2004 to February 2007, HITSELBERGER worked as a contract linguist for Titan Corporation, a subsidiary of L3 Communications and served in several forward operating locations including Fallujah, Al Asad Airbase, Camp Ramadi, and Camp Victory, Iraq. During these deployments he was responsible for translating at various checkpoints and worked intimately with the force protection assets at these locations. From February 2007 until June 2011, HITSELBERGER was self employed in property rental and renovation in Michigan. In June 2011, Global Linguist Solutions, LLC (GLS) offered him a job as a linguist.

19. In June 2011, HITSELBERGER underwent Counterintelligence Screening at the

6

GLS Security Office located in Herndon, VA.  During this screening period, HITSELBERGER underwent security screening, security briefings, and training.  In particular, HITSELBERGER underwent Initial Security Awareness Training.  This training covered the following subjects: Initial Security, Operations Security/Communications Security, and Defensive Travel.  The training explained the types of security clearances and his responsibilities related to having a security clearance.  Specifically, HITSELBERGER received training on proper handling, storage, reproduction, and disposition of classified and sensitive material.  The training provided an example of classified documents with classification markings located at the top and bottom of the document.  HITSELBERGER also received training on the labeling of classified documents and the definitions of the three principal categories of classified information:  TOP SECRET, SECRET and CONFIDENTIAL.  HITSELBERGER received GLS training about where and how classified information could be discussed.  This included the requirement that classified information must be discussed in an area authorized for specified classified discussions.  On June 30, 2011, HITSELBERGER signed an acknowledgment that he received the GLS training.

20.  GLS deployed HITSELBERGER to Naval Support Activity Bahrain in September 2011 in support of the Joint Special Operations Task Force-Gulf Cooperation Council (JSOTF-GCC).  JSOTF-GCC includes Naval Special Warfare Unit Three (NSWU-3), which is located in Bahrain and conducts such missions as unconventional warfare, direct action, combating terrorism, and special reconnaissance.  NSWU-3's proven ability to operate across the spectrum of conflict and in operations other than war in a controlled manner offers decision makers immediate and virtually unlimited options in the face of rapidly changing crises around the world.  Multiple forces relied on HITSELBERGER'S expertise in the Arabic language and sent raw data to him regularly for translation.  Through this data, HITSELBERGER has intimate

knowledge of sensitive source operations, including true names and addresses of sources, and the potential for compromise of this information is of high concern to JSOTF-GCC, the Special Operations Command (SOCOM) and Central Command (CENTCOM) as the smallest leak of this material could result in death of United States military and/or civilian personnel and the compromise of operational military missions in the region.

21.    During Fall of 2011, Master Sergeant (MSG) Dain CHRISTENSEN, a co-worker assigned to the JSOTF-GCC, observed and overheard HITSELBERGER discussing SECRET/NOFORN HUMINT classified information at the Naval Support Activity Bahrain commissary.  Such information is classified at the Secret level, it cannot be shared with foreign nationals, and it derives from human assets.  The discussion was in public in an unauthorized area not specified for classified discussions.  During this incident, HITSELBERGER talked loudly about the document he had just translated, which he thought was interesting.  MSG CHRISTENSEN told HITSELBERGER to stop, but HITSELBERGER laughed at him and began talking about it again.  MSG CHRISTENSEN explained to HITSELBERGER that he could not talk about this type of information out of the office because it was highly sensitive and classified information.    This incident was contrary to GLS pre-deployment training HITSELBERGER had received in June 2011 concerning discussions of classified information in areas not cleared for classified discussions.

22.  On April 11, 2012, at approximately 11:15 a.m., HITSELBERGER, signed into his Secret Internet Protocol Router Network (SIPRnet) account and began by checking his email at a computer workstation within the Joint Special Operations Task Force (JSOTF) office space. This space is a Controlled Access Area (CAA).  During his computer activity, HITSELBERGER was observed by two co-workers viewing JSOTF Situation Reports (SITREPs), which were

classified SECRET, and were outside the scope of his duties as a translator.  HITSELBERGER was then observed printing multiple SECRET SITREP documents from a SECRET printer, which was also outside his scope of duties as a translator.  HITSELBERGER was observed taking the classified documents from the printer, folding them, and placing them into an Arabic-English Dictionary and subsequently placing the dictionary into his personally owned backpack. HITSELBERGER left the CAA and the building with SECRET documents in his backpack. Upon leaving the CAA, HITSELBERGER was stopped outside of the building by members of the command staff and was requested to open his backpack and produce the document he had printed.  HITSELBERGER opened his bag and produced one SECRET document to the command.  The command representative asked HITSELBERGER about the second SECRET document, and HITSELBERGER produced the second document from his backpack.  The classified documents were clearly marked in red lettering at the top and bottom of each page with the word SECRET, followed in bold, red lettering with the associated caveat for each document (NOFORN and REL (releasable) to USA and the United Kingdom, Canada, Australia, and New Zealand, also known as the "Five Eyes" or FVEY).  HITSELBERGER was asked if he had classified documents in his room, and HITSELBERGER responded that he did not.  The classified information in the document in HITSELBERGER'S bag was National Defense Information and outlined current military operational activities in Southwest Asia.

23.  On April 11, 2012, HITSELBERGER, in a voluntary statement to NCIS, admitted to printing the SECRET documents and placing them in his backpack.  HITSELBERGER positively identified the documents which were shown to him by NCIS Special Agents as documents he removed from the JSOTF CAA.  HITSELBERGER stated that he printed the documents with the intention of reading them in his base room.  HITSELBERGER stated he did

not realize that the documents he removed were classified.   HITSELBERGER was asked if he knew what the classification markings on the documents he took meant.   HITSELBERGER claimed not to know what the meaning of NOFORN or REL to USA, FVEY after SECRET meant.

24.   On April 12, 2012, NCIS Special Agents conducted a Command Authorized Search and Seizure of HITSELBERGER'S living quarters in Bahrain.   This authorization is granted by the person serving in a position of command who has control of the place or property where the person is situated or found and is done so in a neutral and detached manner akin to the process undertaken by a Federal Magistrate Judge in issuing a search warrant.   The room was extremely cluttered and contained hundreds of newspapers, numerous books and storage containers.   There was a bag full of customs forms used for mailing packages and numerous items containing Arabic writing and various types of computer and electronic components.   A document appearing to be classified was discovered lying on the top of HITSELBERGER'S desk in plain view.   The top and bottom of the document had been cut off, effectively removing the classification markings in the header and footer of the document, which concealed the overall classification of the document.   The document still had the individual paragraph classification markings, which revealed the document was classified.   During a subsequent interview of HITSELBERGER, he admitted the document was classified SECRET and that he knowingly cut off the header and footer of the document, removing the classification markings, further admitting that it was very incriminating to have that document with the markings removed. Through subsequent investigation, NCIS agents obtained the original document from U.S. Navy officials, and reviewed and compared the original document to the one found on HITSELBERGER'S desk.   The document in its entirety was classified SECRET and was five

(5) pages in length.  To date, the remaining four (4) pages have not been recovered and their whereabouts are unknown.

25.  Further investigation revealed that the classified computers accessed by HITSELBERGER in the JSOTF-GCC CAA were controlled to prevent users from copying electronic files from the computer system and making unauthorized removals from the area. These computer security steps were implemented to prevent an authorized user from removing classified material in an unauthorized manner.  The JSOTF-GCC computers' USB ports, used to download and/or remove information contained on the computer to removable and portable thumb drive storage devices, were disabled.  By disabling the USB ports on the SIPRnet computer systems, the computer security specialists effectively prevented anyone from inserting a thumb drive into the system and downloading classified documents to a thumb drive for possible removal from the facility.  Because the USB ports were disabled, the only way to remove classified material from the CAA without removing the computer system itself was to print documents from the classified computer systems and physically carry them out of the building.

.  26.  Postal records indicate that HITSELBERGER mailed more than 86 packages from the Naval Support Activity Bahrain Post Office to the United States since September 2011. HITSELBERGER mailed approximately 34 of these packages to an address in Ontonagon, Michigan, addressed to himself or to a neighbor, Kenneth ISON.  The declaration forms on many of the packages identified contents which appeared to be inconsistent with the actual package weights.  Different packages identified the same or similar contents at the same values, but with significantly different postage costs.  The cost to mail some of the packages sometimes exceeded the declared value of the packages themselves.  HITSELBERGER mailed a package from the

Naval Support Activity Bahrain post office on April 12, 2012 to his address in Ontonagon, MI.

27.    On April 14, 2012, NCIS Special Agents conducted an interview of HITSELBERGER'S suite-mate who shared the common area of a suite, but maintained his own bedroom up to December, 2011.  The suite-mate described HITSELBERGER as a "hoarder", relaying HITSELBERGER'S room was filled with stacks and stacks of reading material, multiple copies of same issue newspapers, soaps and shampoos from hotel rooms, and an extensive collection of teas.  The witness said HITSELBERGER indicated he had unspecified interaction with the locals in town and made the statement "I'll become whatever religion they want me to be in order to get information from the locals".  The witness stated HITSELBERGER would talk to locals about current events, was attending a mosque and sought input from "both sides" in the context of seeking information from Sunni as well as Shia members of the local community.  The witness said HITSELBERGER had access to sensitive source operations in highly sensitive areas and would potentially know the true name of sources to include bank account information and locations.  The next suite-mate that shared the suite area from December 2011 to present was interviewed and related HITSELBERGER received many phone calls on his room phone and was "always talking in Arabic during these conversations which would go on until late in the night".  The witness could not recall HITSELBERGER having a telephone conversation in English.

28.    On April 14, 2012, NCIS Special Agents conducted an interview of one of the members of HITSELBERGER'S command, who stated HITSELBERGER may have had access to all communications with sensitive sources in highly sensitive locations, including communication procedures, true names and tradecraft used by the sources.  The witness related HITSELBERGER'S access could have potentially compromised everything with respect to

source operations in Iraq.   The witness said this is primarily because there is no video surveillance or electronic card swipe devices to monitor the entering or exit of HITSELBERGER'S work space, thereby giving HITSELBERGER unfettered access to information 24 hours a day.

29.   Based upon the security violation, JSOFT-GCC requested HITSELBERGER be replaced and asked GLS to remove him from Bahrain.   On April 12, 2012, HITSELBERGER left Bahrain and, during a scheduled 4.5 hour layover in Germany, abruptly changed his travel plans and changed his connecting flight, delaying his travel to the United States by more than two (2) weeks.   During his first days in Germany, HITSELBERGER was in contact with his employer GLS, however according to the GLS security officer, HITSELBERGER was 'highly deceptive' regarding his location and intentions and would not correctly give GLS the information they needed to ensure HITSELBERGER was experiencing good health and welfare.   GLS personnel continue to request HITSELBERGER'S exact location but as of April 20, 2012, HITSELBERGER has not provided a specific address or telephone number to GLS.

30.  On April 18, 2012, acting on open source information, NCIS and FBI Special Agents conducted a search of a collection located within the Hoover Archives at Stanford University in California.   The collection is titled "James F. Hitselberger collection, 1977-2012" and resides within the Stanford University Library.   The collection consists of 18 manuscript boxes and is further described as 7.2 linear feet of information.   The search resulted in the recovery of one (1) document classified SECRET/ REL FVEY (releasable to Australia, Canada, New Zealand, United Kingdom and the United States) and dated February 2012.   Two (2) other classified documents were discovered in a separate section of the Stanford University Library and those documents are described as one (1) Intelligence Information Report (IIR) classified SECRET/

REL USA and one (1) untitled document classified SECRET.  A letter dated July 8, 2005, and written by HITSELBERGER accompanied the SECRET/REL USA IIR.  It was addressed to Brad BAUER, the former Associate Archivist for Collection Development for the Hoover Archives.  The letter indicated the accompanying document was classified and further cited the declassify date of March 23, 2015.  It is important to note that neither HITSELBERGER nor BAUER is an original classification authority for the classified information, and cannot simply declassify the document because the time has elapsed.   The letter further indicated HITSELBERGER claimed he found the document, which he said had been misplaced at a check point in Fallujah, Iraq.  Instead of protecting the document and providing it to security as required, HITSELBERGER mailed it along with other material to the Hoover Archives, admitting one of the documents was classified as SECRET.  HITSELBERGER in the letter to BAUER states, "Regardless of the case, this material seems to warrant archival preservation.  I will leave the matter up to you to determine when researchers can have access to these items, as I am fully confident that your institution balances national security concerns with the need of researchers for original source material".

31.  The search of the Hoover Archives also revealed 'hard copies' of several email communications between HITSELBERGER and personnel at the Stanford University Library. These communications, starting with the most recent, consisted of the following:

- April 11, 2012 e-mail to HITSELBERGER at his e-mail account jfh@gmail.com from the Hoover Archives Collection Manager, saying the archives received his box containing "Bahrain Ephemera" on April, 11 2012.

- April 4, 2012 e-mail to HITSELBERGER at his e-mail account jfh@gmail.com from the Hoover Archives Collection Manager informing him that the four (4) envelopes

HITSELBERGER sent from Bahrain were received and will be added to the collection.

- March 21, 2012 e-mail to HITSELBERGER at his e-mail account jfh@gmail.com from the Hoover Archives Associate Archivist advising him they had received "two issues from Bahrain" and they had arrived on March 20, 2012.   The e-mail recommends that HITSELBERGER contact Stanford's Islamic and Middle Eastern Collection curator for future submissions and potential purchases by the Hoover Archives.

- March 17, 2012 e-mail from HITSELBERGER, using his e-mail account jfh@gmail.com, to the Hoover Archives Associate Archivist stating, "Now that I have gotten your full name and title straight I will start sending quite a number of Bahrain things I get my hands on from both opposition and government sources that have a relevance to politics here."

- February 24, 2011 e-mail chain between HITSELBERGER, using his e-mail account jfh@gmail.com, and the former Associate Archivist, Brad BAUER, advising tht HITSELBERGER was in Phoenix, AZ, and that when he returned to Michigan, he would send "promised materials," which according to an e-mail entry further down the chain may pertain to the "German Subject Collection" and a "neo-nazi march."

32.   Based on the discovery of these e-mail communications, and through my investigative experience, I believe there is probable cause that evidence of HITSELBERGER communicating with the Hoover Archive about classified information, and likely with others, will be in the Target Account.

## VI.   EVIDENCE LIKELY TO BE OBTAINED IN SEARCH OF AN E-MAIL ACCOUNT

33.   Based on my training and experience, and information provided to me by other law enforcement agents, I know the following:  First, searches of e-mail accounts usually provide information that helps confirm the identity of the user(s) of the e-mail accounts.   Second,

individuals who use e-mail in connection with criminal activity, or activity of questionable legality, often set up separate e-mail accounts to be used solely for limited criminal purposes. This is often part of an effort to avoid detection and to separate personal communication from communication and information that is related to the criminal activity.  Third, when the criminal violation involves a conspiracy or a crime involving others, a search of an e-mail account often allows the identification of co-conspirators.

34.  In this case, a review of the stored electronic communications of the Target Account will help identify other instances in which HITSELBERGER has sent classified information to others not authorized to receive or has discussed doing so, as well as other persons, either witting or unwitting, with whom he is working.  The review of the stored electronic communications of the Target Account will further enable NCIS and the FBI to identify other possible violations and violators of the Espionage Act and related statutes.

35.   There is no basis to believe that the Target Account contains any privileged communications.

## VII.   STATUTORY BASIS FOR THE REQUESTED SEARCH AND SEIZURE: THE ELECTRONIC COMMUNICATIONS PRIVACY ACT

36.   The requested search warrant is authorized by the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2711.

a.    18 U.S.C. § 2703(a) provides, in part:

A governmental entity may require the disclosure by a provider of electronic communication service of the contents of an electronic communication that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued under the Federal Rules of Criminal Procedure or equivalent State warrant.  A governmental entity may require the disclosure by a provider of electronic communication that has been in electronic storage in an electronic communications system for more than one hundred and eighty days by the means available under subsection (b)

of this section.

b.    18 U.S.C. § 2703(b) provides, in part:

(1) A governmental entity may require a provider of remote computing service to disclose the contents of any wire or electronic communication to which this paragraph is made applicable by paragraph (2) of this subsection —

(A) Without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation or equivalent State warrant; or . . . .

(2) Paragraph (1) is applicable with respect to any wire or electronic communication that is held or maintained on that service —

(A) On behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such remote computing service; and

(B) Solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.

c.    The Government may also obtain records and other information pertaining to a subscriber to or customer of an electronic communication service or remote computing service by way of a search warrant.  18 U.S.C. § 2703(c)(1)(A).  No notice to the subscriber or customer is required.  18 U.S.C. § 2703(c)(2).

d.    18 U.S.C. § 2711 provides, in part:

As used in this chapter – (1) the terms defined in section 2510 of this title have, respectively, the definitions given such terms in that section; and (2) the term "remote computing service" means the provision to the public of computer storage or processing services by means of an electronic communications system.

e.    18 U.S.C. § 2510 provides, in part:

17

(8) "contents," when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication;...(14) "electronic communications system" means any wire, radio, electromagnetic, photooptical or photoelectronic facilities for the transmission of electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications; (15) "electronic...communication service" means any service which provides to users thereof the ability to send or receive wire or electronic communications;... (17) "electronic storage" means - (A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication.

f.      18 U.S.C. § 2703(g) provides, in part:

Notwithstanding section 3105 of this title, the presence of an officer shall not be required for service or execution of a search warrant issued in accordance with this chapter requiring disclosure by a provider of electronic communications service or remote computing service of the contents of communications or records or other information pertaining to a subscriber to or customer of such service.

## VIII.   SEARCH PROCEDURE AND ITEMS TO BE SEIZED

37.   Based on the foregoing, I request that the Court issue a search warrant in accordance with the Electronic Communications Privacy Act – and specifically 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(2)(A) – authorizing a search of the place identified in Attachment A to this Affidavit and to the Search Warrant, using the procedures set forth in Section I of Attachment B to this Affidavit and to the Search Warrant, and authorizing the seizure of items particularly described in Section II of Attachment B to this Affidavit and to the Search Warrant.

## IX.    REQUEST FOR NON-DISCLOSURE BY PROVIDER

38.   Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding Google not to notify any other person, including the subscriber of the Target Account, of the existence of the warrant because there is reason to believe that notification of the existence of the

warrant will result in: (1) flight from prosecution; (2) destruction of or tampering of evidence; (3) intimidation of potential witnesses; or (4) otherwise seriously jeopardize the investigation. The involvement of the Target Account as set forth above is not public and I know, based on my training and experience, that subjects of criminal investigations will often destroy digital evidence if the subject learns of an investigation.  Additionally, if Google or other persons notify anyone that a warrant has been issued on the Target Account, the targets of this investigation and other persons may further mask their identity and activity and seriously jeopardize the investigation.

## X.      REQUEST FOR SEALING

39.  It is respectfully requested that this Court issue an order sealing, until further notice of the Court, all papers submitted in support of this application, including this affidavit, the application, and the warrant itself, except that a copy of the warrant, including its attachments, shall be served upon Google.   I submit that the requested sealing is necessary because the information and items to be disclosed and seized are relevant to an ongoing investigation into the criminal activities described herein. Additionally, this investigation is partially predicated upon corroborated information from a cooperating defendant who may be subject to retaliation if his or her identity is disclosed. Based upon my training and experience, I have learned that online criminals actively search the Internet for criminal affidavits and search warrants and disseminate them to other online criminals as they deem appropriate, such as by posting them publicly online. Premature disclosure of the contents of this affidavit and related documents may compromise this ongoing investigation by, among other things, causing the subject(s) to flee and suspect(s) to destroy or alter evidence.

## XI.    CONCLUSION

39.    In summary, based upon the above facts and information, I submit that there is probable cause to believe that within the information associated with the account, **jfh1956@gmail.com**, the Target Account, which are on computer servers owned, maintained, controlled, or operated by Google, located at 1600 Amphitheatre Parkway, Mountain View, California, there exists evidence, fruits, and instrumentalities of criminal violations of the Espionage Act, 18 U.S.C. § 793(d), and of 18 U.S.C. § 1924.  Accordingly, I respectfully request that a warrant be issued.


_____
Richard J. Puryear
Special Agent
Naval Criminal Investigative Service


Subscribed and sworn to before me on April _____, 2012


_____
DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

## **ATTACHMENT A**

### PLACE TO BE SEARCHED

The place to be searched is computer servers and records which are owned, maintained, controlled, or operated by Google Inc., located at 1600 Amphitheatre Parkway, Mountain View, California.

## ATTACHMENT B

## ITEMS TO BE SEIZED

**I. Information to be Disclosed by Google Inc. and Procedures to be Followed**

A.  Pursuant to 18 U.S.C. § 2703, Google Inc. (hereinafter "Google"), a provider of electronic communication and remote computing services, located at 1600 Amphitheatre Parkway, Mountain View, California, is hereby ordered to disclose to the government, the following information associated with the e-mail account **jfh1956@gmail.com** (the "Target Account")

1.   The contents of all electronic mail, including but not limited to: sent e-mail, received e-mail, opened e-mail, unopened e-mail, deleted e-mail, and draft e-mail, including all headers and footers, if available, and all attachments, including videos, computer files, and files sent to and received from other websites, if applicable, stored, retained or presently contained in, or on behalf of, or otherwise associated with, the Target Account, including any data preserved or retained by Google in whatever form or file.

2.   All records or other information regarding the identification of the Target Account, to include:  full name; physical address; telephone numbers and other identifiers; records of session times and durations; method of connection to the ISP or to services provided by the ISP; any address used in connection with the account; the date on which the account was created; the length of service; the types of service utilized; the IP address used to register the account; log-in IP addresses associated with session times and dates; account status; alternative e-mail addresses; methods of connecting; log files; and means and sources of payment (including any credit or bank account number).

3.   All records or other information stored by an individual using the Target Account, including address books, friends, contacts and buddy lists, calendar data, documents, pictures, group affiliations, message board usage, message board posting, mini-feeds, status update histories, shares, notes, wall postings, future and past events invited to or hosted, private messages, instant messages, personal web space, and other files.

4.   All records pertaining to communications between Google and any person regarding the Target Account, including contacts with support services and records of actions taken; and

5.   All records indicating the services used by subscribers of the Target Account, including but not limited to instant messaging services, geo-location services, alerts, and advertising services.

6.   Any search queries or cookies accumulated as a result of any

Google service.

       7.     Method and details of any payments, including credit card numbers used.

B.  Google shall deliver the information set forth above within fifteen (15) after service of this warrant and Google shall send the information via facsimile and U.S. mail, and where maintained in electronic form, on CD-ROM or an equivalent electronic medium, to:

      SPECIAL AGENT RICHARD J. PURYEAR
      Naval Criminal Investigative Service
      2822 Doherty Drive, SW, Suite 411
      Joint Base Anacostia-Bolling
      Washington, DC
      Direct: 202.433.2442
      jeff.puryear@navy.mil

C.  Google shall not notify any other person, including the subscriber of the Target Account, of the existence of the warrant.

D.  Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II. Information to be Seized by Law Enforcement Personnel

The items to be seized, which are believed to be evidence and fruits of violations of the Espionage Act, 18 U.S.C. § 793(d), and of 18 U.S.C. § 1924, are as follows:

       1.     Records and information related to violations of the aforementioned statutes;

       2.     Records and information related to any communications between HITSELBERGER and the Hoover Archives at Stanford University, Palo Alto, California;

       3.     Records and information related to any communications between HITSELBERGER and any other person or entity concerning classified information;

       4.     Records and information related to any classified information;

       5.     Records and information related to any communications between HITSELBERGER and any other person or entity concerning HITSELBERGER's deployments to Iraq and Bahrain and any materials HITSELBERGER obtained during those deployments;

6.	Records and information related to the identity of HITSELBERGER and any aliases he may have used;

7.	Records and information related to HITSELBERGER'S schedule of travel or travel documents; and

8.	Records and information related to any bank records, checks, credit card bills, account information, and other financial records.